**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KELLY JONES,<br><br>Plaintiff,<br><br>v.<br><br>WARDEN CYNTHIA STUFF,<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:25-CV-01690-BYP<br><br>JUDGE BENITA Y. PEARSON<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>CARMEN E. HENDERSON<br><br>**REPORT AND RECOMMENDATION** |

## I. Introduction

Petitioner Kelly Jones seeks a writ of habeas corpus under 28 U.S.C. § 2254. Jones is an Ohio prisoner who is currently serving an aggregate sentence of a minimum mandatory term of 22 and a half years up to a maximum of 28 years. Respondent State of Ohio filed a return of writ on December 22, 2025. (ECF No. 9). Jones filed a traverse on April 9, 2026. (ECF No. 12). On April 23, 2026, Respondent filed a sur-reply. (ECF No. 13).

This matter was referred to me under Local Rule 72.2 to prepare a report and recommendation on Jones's petition and other case-dispositive motions. Because Jones has presented only procedurally defaulted claims, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

## II. Relevant Factual Background`

The Ohio Court of Appeals for the Eighth Appellate District set forth the following facts[1] on direct appeal:

[1] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

{¶ 9} At trial, the state presented testimony from eleven witnesses: [Jeraldine] Campbell ([Ernestine] Dumas' neighbor); Leticia Rice (the 911 operator who received Dumas' 911 call); paramedic Kim Florczyk (one of the EMS personnel who examined and treated Dumas at the scene); Dr. Christopher Brandt (one of the physicians who treated Dumas' burn injuries); Mark DePhillips (a former Cleveland firefighter and arson investigator, who was at the scene); Charles Jones and Terencita Jones-Green (Dumas' nephew and niece) and various police officers. In addition to the witnesses testimony, the state introduced photographs taken by the arson investigator at the scene (state exhibit Nos. 4-39), the audio recording of Dumas' 911 call (state exhibit No. 3), excerpts of footage from the body cameras of Cleveland police officers James Donnellan and Kenneth Potchatek (state exhibit Nos. 1, 1.2 and 43) and the EMS run report (state exhibit No. 47). The parties stipulated to the "relevancy and admissibility" of over 1800 pages of medical records, including photographs, detailing Dumas' injuries, diagnoses and medical care and treatment related to the incident (state exhibit No. 46). A summary of the relevant evidence follows.

**1. Testimony of Neighbor**

{¶ 10} Campbell lived "[a]cross the street down a little bit" from Dumas and was an "acquaintance" of Dumas. The two women had known each other since they were children and had "grown up together." Campbell testified that on July 12, 2019, Dumas came to her house, told Campbell she needed to go to the hospital and asked Campbell if she would take her to the hospital. Campbell stated that Dumas appeared "calm," looked "well put together" and that she was initially unaware that Dumas had been burned. Campbell testified that Dumas told her "Kelly had thrown fire on her" but "didn't go into any detail." Campbell indicated that she knew who "Kelly" was, i.e., a man who had been living in Dumas' home, and identified "Kelly" in court as Jones. Campbell stated that she told Dumas she did not drive at night, "so she would do better if we called 911," and she then called 911. Campbell indicated that Dumas stayed at her home until an ambulance arrived and that Campbell went with Dumas to the hospital. Campbell testified that she knew Dumas had "some cognitive something" and was in "some stage" of dementia and stated that she advised police and fire department personnel on the scene of that fact so they knew "what they were dealing with."

**2. Testimony of the 911 Operator and the 911 Call**

{¶ 11} Leticia Rice ("Rice") was working as a 911 operator on the evening of July 12, 2019, when she received a call from Dumas. The state played an audio recording of the 911 call for the jury (state exhibit No. 3), which Rice confirmed was "a fair and accurate depiction" of the call she received from Dumas:

> Rice: 911. Did you need police, fire, or ambulance?
>
> Dumas: Police.
>
> Rice: To what address?
>
> Dumas: Oh. I need an ambulance too.

> Rice: Oh, you need an ambulance?
>
> Dumas: I need the police and an ambulance. This guy I let stay in my house is going crazy and throwed gasoline and something on me trying to burn my mother's house down. * * * [unintelligible; Rice talks over her]
>
> Rice: He threw gasoline on you?
>
> Dumas: Yes. Set me on fire.
>
> Rice: Ok. He set you on fire already, ma'am?
>
> Dumas: Yes ma'am, and I'm out now but it's on face, arms, and chest.
>
> Rice: Ok. What's your address. What's your address? Tell me. * * * You are calling from someone else's phone?
>
> Dumas: Right.
>
> Rice: Is he still inside of the house?
>
> Dumas: He was when I left.
>
> Rice: Ok. What's your name?
>
> Dumas: Ernestine Dumas.
>
> Rice: Stay on the line with me.
>
> Dumas: I'm on fire. I've got to get to the hospital.
>
> Rice: You said you were not on fire anymore?
>
> Dumas: I said I've got to get to the hospital.
>
> Rice: Ok. Ok. What's the guy's name that did it?
>
> Dumas: Kelly Jones. I let him stay with me 'cuz he didn't have nowhere to stay but he came in all looped out, high, and [unintelligible] went crazy on me.
>
> Rice: Did you remember anything like what he was wearing just in case so we can catch him if he leaves?
>
> Dumas: He had on like a sweatsuit at the bottom.
>
> Rice: What color?
>
> Dumas: I think they're black.
>
> Rice: Black. Is he black, white, or Hispanic?
>
> Dumas: Black.

Rice then transferred Dumas to the EMS dispatcher, where the following exchange occurred:

EMS Dispatcher: Cleveland EMS. What's the address of the emergency? * * *

Dumas: I've been set on fire and I'm burning up. * * * I'm at my neighbor's right now 'cuz he was still in the house when I left out of there. Ma'am I'm on fire. I've got to get to a hospital.

* * *

EMS Dispatcher: You said you're on fire right now?

Dumas: I'm burning up on fire like burning fire.

EMS Dispatcher: What do you mean by you're burning up on fire?

Dumas: He set me on fire ma'am.

EMS Dispatcher: Are you still on fire?

Dumas: No. I'm out. I put my own self out.

EMS Dispatcher: Ok. How old are you?

Dumas: 78

EMS Dispatcher: When did this happen?

Dumas: About an hour ago.

EMS Dispatcher: Is anything still burning or smoldering?

Dumas: No.

EMS Dispatcher: Is everybody safe and out of danger?

Dumas: There was no one there but he and I.

EMS Dispatcher: Ok, but is everybody safe and out of danger?

Dumas: [unintelligible] Yes. Ma'am I got to go. Bye.

EMS Dispatcher: I need you to stay on the line with me.

Dumas: [unintelligible] I'm turning red.

EMS Dispatcher: We're going to send an ambulance to you. * * *

{¶ 12} Campbell then got on the line, responded to further questions from the dispatcher regarding Dumas' injuries and received instructions from the dispatcher regarding care to provide to Dumas until emergency medical personnel arrived.

{¶ 13} Rice testified that she did not know Dumas or Jones, knew nothing about them and did not know whether Dumas had accurately described what had occurred.

**3. Testimony of Police, Arson Investigator and Medical Providers**

{¶ 14} Cleveland police detective James Donnellan ("Donnellan") was working as a Cleveland patrol officer on July 12, 2019 when he responded to a call at Dumas' residence sometime after 10:00 p.m. Dumas was, at that time, across the street at Campbell's house. Donnellan testified that he and his partner, patrol officer Hicks, were the first officers on the scene. He stated that when they arrived on scene, he observed that the outside pane of glass (but not the inside pane of glass) on one of the home's front windows had been broken and that glass was scattered on the front porch, i.e., as if someone had been trying to break the window from the outside. Donnellan did not observe any object that might have been used to break the window and could not state when the window had been broken. While waiting for "back up" to arrive so that they could "clear the house," Donnellan went to the Campbell's home to speak with Dumas.

{¶ 15} Donnellan testified that when he arrived at Campbell's house, Dumas was "being treated by Fire and EMS." He described Dumas as "an older lady, very thin, very frail looking," who appeared "very out of it" and "scared." He indicated that she "didn't look to be in very good shape" and that he had observed burns on her arms and neck.

{¶ 16} Donnellan stated that he spoke with Dumas briefly as she was being treated by the paramedics. His conversation with Dumas was recorded on his body camera. During Donnellan's testimony, the state played excerpts of the body camera footage (both audio and video recordings) for the jury (state exhibit No. 1), which included the following exchange:

> Donnellan: Hi miss. Do you know this guy?
>
> Campbell: She knows him.
>
> Donnellan: Are you pretty sure that he's in the house?
>
> Dumas: I don't know whether he's still in there now * * * [unintelligible; officer talks over her]
>
> Donnellan: Did he dump the gas on you in the house?
>
> Dumas: Yes. * * * [unintelligible; officer talks over her]
>
> Donnellan: Because there's a big hole in your window.
>
> Dumas: He bust the window out with a stick.
>
> Donnellan: Did he come in the front door?
>
> Dumas: He had a key to my house * * * [unintelligible]
>
> Donnellan: Who is this guy?
>
> Dumas: His name is Kelly Jones.

{¶ 17} Because the volume was low and the audio portion of the body camera footage was difficult to hear, Donnellan also testified regarding what Dumas had told him when he spoke with her at her neighbor's home:

Q. Do you recall what she had said to you?

A. Yes. She told us the name of the suspect.

Q. And what suspect name did she give you?

A. Kelly Jones.

Q. You had asked her about a hole in the window. Do you recall what if anything she said about that?

A. I can't remember. It was kind of hard for me to hear. I can't remember exactly what she said.

* * *

Q. What are you asking her about?

A. I'm asking her if the suspect who did this to her is — would still — if she believes that he would still be in the house and then I also mentioned — I asked her what happened to her front window, why it was broken out, and she seemed very confused about that.

Q. Do you know if the suspect was still in the house?

A. At this time I did not know. * * * I asked who the — I asked again who did this to her, trying to get information on the suspect, and she said it was Kelly Jones.

{¶ 18} Donnellan stated that he spoke with Dumas only "briefly" because he was "more concerned" "about if the suspect was still in the house" and "getting [her] to the hospital for treatment" than "taking her through a long interview process at that time." He stated that he did not have any further discussions with Dumas because it was later determined that he and his partner would only be "assisting on the assignment" and "when we do those assisting roles like that, I try not to get too much of an involved statement from a witness or a victim so that they won't have to repeat it again down the line to the car who is actually handling the report."

{¶ 19} After speaking with Dumas, Donnellan returned to Dumas' residence. By this time, other officers had arrived at the scene, including Cleveland patrol officer Kenneth Potchatek ("Potchatek") and his partner, Cleveland patrol officer Jacob Strehle ("Strehle"), who was then in field training. Donnellan's and Potchatek's body cameras recorded their actions, observations and statements at the scene, excerpts of which were played for the jury as the officers testified. (State exhibit No. 43 and defense exhibit A.)

{¶ 20} Potchatek testified that he responded to a call that was broadcast as "a female that was set on fire." When he arrived, two other zone cars, fire and EMS were already on scene. He stated that he knew Dumas, that he had been at Dumas' residence "[t]wo or three" times prior to July 12, 2019, including responding to a report by Dumas that there were people living in her (uninhabitable) attic, and that he knew Dumas had dementia.

{¶ 21} Potchatek testified that when he arrived on scene, he spoke with Donnellan and informed Donnellan that he was a certified intervention team ("CIT") officer and that Dumas had been previously "certified CIT," i.e., referred to CIT, due to her dementia.

{¶ 22} Donnellan, Potchatek and other officers entered Dumas' home and proceeded to "clear" it. Donnellan testified that when he entered the home, he noticed a "distinct odor" that smelled like a combination of "some sort of accelerant" — not gasoline but a "pungent" "chemical smell" — burning paper and burning plastic. Officers went "room by room" and did a "cursory search" to see if there were any potential suspects inside. No one was inside the home.

{¶ 23} Donnellan and Potchatek described for the jury what they observed as they went through the home. Donnellan noted that the front window with the broken glass was a bedroom window. He stated that, in that room, debris was on the ground, "like somebody had scattered or torn through that part of the room," along with approximately three "half full or empty" bottles of rubbing alcohol, burnt paper and a burnt lampshade. He indicated that the fire was a "small fire" — a lampshade and some papers in a "confined area" — and was "not even a big part of the room it was in." Potchatek similarly testified that the fire was a "small fire," "isolated to a small area in one of the bedrooms of the house," and that "it took a little bit of time" to find where something had been burned. Donnellan stated the officers never determined "whose bedroom was whose," but that Jones' wallet was later found in the bedroom where the fire had occurred.

{¶ 24} Donnellan testified that the bottles of rubbing alcohol were "dented in," "[k]ind of smashed," "like you would be squeezing it." He indicated that another "squeezed" bottle of rubbing alcohol was found outside on the front porch near the broken glass.

{¶ 25} Based on what is observed on the body camera footage, the officers were in Dumas' home for less than two minutes.

{¶ 26} Potchatek testified that, considering what he had seen in the residence, i.e., that only the lampshade had been burned, and his prior interactions with Dumas, he initially concluded that the fire "appeared accidental," i.e., that "it may not have happened the way * * * it was told initially." He expressed this opinion to Donnellan and the other officers on the scene.

{¶ 27} Donnellan testified that once the home was cleared, he called in representatives of the Cleveland Fire Department to determine whether it was "okay to leave" the home in its current condition or whether they needed to "dump some sort of extinguisher on it." He stated that there were no flames or smoke in the home and that he was "just being safe." The firefighters entered the home, looked at the remains of the fire and determined that nothing needed to be done.

{¶ 28} While Donnellan interacted with the fire department personnel, Potchatek attempted to speak with Dumas. Dumas was, at that time, in the back of an ambulance receiving medical treatment, getting ready to be transported to the

hospital. Potchatek testified that his purpose in speaking with Dumas was "[t]o get her side of the story, * * * to have her tell us what happened." The state introduced body camera footage (state exhibit No. 43) that captured the following exchange:

> Q. Hello honey. How are you today?
>
> A. [unintelligible] get to a hospital.
>
> Q. What happened?
>
> A. He tried to burn me.
>
> Q. Who did?
>
> A. The guy that I let live with me.

{¶ 29} Potchatek confirmed that Dumas had then told him that "[t]he guy who lived there with me" had burned her. The interview was, at that point, interrupted; EMS personnel informed Potchatek that they were leaving the scene to take Dumas to the hospital.

{¶ 30} Potchatek returned to the scene and spoke with Donnellan. Potchatek again expressed his view that the fire was accidental and told Donnellan more about his prior interactions with Dumas. Potchatek said that Dumas was "crazy," had "serious dementia" and should not be living alone. Donnellan testified that he had had no prior dealings with Dumas but that "in the short amount of time [he] had with her, [he] didn't believe that she was displaying any of those mental issues" when he spoke with her. The officers decided that because Dumas' residence was in Potchatek's zone and Potchatek had had prior dealings with Dumas, Potchatek and Strehle would be the "primary" on the case, i.e., they would take over the investigation and write the report.

{¶ 31} Potchatek and Strehle went to the hospital to interview Dumas while Donnellan and other officers "secured the scene." The officers at the scene waited for a supervisor to arrive to decide whether the home should be treated as a crime scene and whether an arson investigation was warranted. At some point later, the supervisor, Sergeant Mark Bickerstaff ("Bickerstaff"), arrived on scene.

{¶ 32} Mark DePhillips ("DePhillips") was an arson investigator for the Cleveland Fire Department at the time of the incident. He testified that when he arrived on the scene, he spoke with the responding police officers to try and figure out what had happened, then went to inspect the residence. He stated that as he walked toward the residence, he saw "broken windows" and a bottle of rubbing alcohol that had been "obviously squeezed and drained." He testified that when he entered the residence, he saw little to no smoke or soot damage and that there was "no real heavy fire damage," just "some charring * * * with magazine, newspaper type things" and a lampshade that had melted. He said there was no odor of smoke and that, although there was a "faint odor" of rubbing alcohol, it dissipated fairly quicky with the doors open.

{¶ 33} With respect to accelerants, DePhillips testified that, when inspecting the residence, he observed three or four bottles of "highly flammable" rubbing alcohol, "squeezed or pressed like you would need to do to actually force it out of the bottles." He stated that, based on what he saw, he believed the fire was caused by the rubbing alcohol and an intentional, open flame, but that he did not know who may have squeezed the bottles, who may have ignited the rubbing alcohol or what the ignition source was. He stated that he believed the ignition source was an "intentional" open flame, such as matches, a lighter or a cigarette, because he did not see any signs of "accidental sources," such as lightning or an electrical fire.

{¶ 34} DePhillips testified that, based on his inspection, he did not see anything at the scene to indicate an "intent to light the structure on fire," but that, at that time, he did not have the "full story," i.e., he did not know that "the burning was on the victim herself." DePhillips testified that after his inspection, he spoke with Bickerstaff and that Bickerstaff told him the Cleveland Police Department would handle the matter. He indicated that, based on what he saw with regard to the structure, he told Bickerstaff "something to the effect" that he "couldn't stretch this into an [aggravated] arson if [he] wanted to." However, DePhillips was unaware, at that time, that Dumas had been badly burned. He stated that if he had known that fact, the matter "would have been pursued as an aggravated arson."

{¶ 35} At the hospital, Potchatek and Strehle interviewed Dumas "at great length" for "[m]aybe an hour" as she was "being treated" and "learn[ed] more details" about what occurred. Strehle testified that Dumas had been treated for pain and was in the "emergency bay" when the officers interviewed her. Strehle stated that Dumas was "very much in pain" but "lucid and calm." Potchatek offered similar testimony regarding Dumas' demeanor. Potchatek explained that, due to HIPPA restrictions, the officers were unable to record their interview with Dumas at the hospital.

{¶ 36} Potchatek testified that he and Strehle were using the hospital interview of Dumas as "investigative means." He stated that, during the interview, Dumas identified Jones as the suspect, provided a description of Jones, described how she was injured, including that "a clear liquid" was the "accelerant or mechanism that caused [her] burns," and told officers that her vehicle had been damaged. Strehle testified that Dumas told the officers that "she had been burned by her live-in tenant Kelly Jones," that while Jones was "in the midst of destroying her property," i.e., after he set her lampshade on fire and she tried to stop him, Jones "attacked her" and "set her on fire" and that "after he set her on fire[,] he went to set her car on fire."

{¶ 37} Strehle stated that no one had advised him, during or prior to his interview of Dumas, that she had a history of dementia or had been previously referred to CIT. Although acknowledging his prior concerns regarding Dumas' mental condition, Potchatek stated that he did not believe Dumas was "manifesting" any of her "psych issues" during the interview because "[e]very detail she gave us played out."

{¶ 38} Strehle "broadcast" the information they had obtained from Dumas to the officers who remained at the scene and requested that they look at Dumas' car for

any burn damage. Donnellan testified that he did not observe any damage to Dumas' vehicle but found "[l]ike some sort of candle or a ball of some sort of wax that looked like it could have been used to light something" on the hood of the car near the windshield wiper. Donnellan stated that the arson investigator was still at the scene, so Donnellan asked him to verify what he was seeing, and then informed Potchatek what he had found.

{¶ 39} Donnellan testified that while he and other officers were standing on Dumas' porch, "holding down the scene," a man (later identified as Jones) began walking towards the house. Donnellan testified that the man's clothing matched the description of the clothing officers had been given for the suspect. Donnellan identified Jones in court as the man who appeared at the scene.

{¶ 40} Donnellan testified that he approached the man and asked him to identify himself but that the man refused to do so and, instead, kept asking, "What's going on? What's going on?" Donnellan stated that he detained the suspect, read him *Miranda* warnings and, based on identification contained in a wallet found inside the house, identified the man as Jones. Donnellan indicated that, based on his brief conversation with Jones, Jones appeared to be intoxicated. Donnellan testified that they arrested Jones "based on the victim's statements and the evidence on scene" "[b]ecause of the information we had on the suspect and the fact that the victim gave us his name and we were able to positively identify him when he came back on scene through his ID and because of the clothes he was wearing."

{¶ 41} After arresting Jones, Donnellan contacted Potchatek, who was still at the hospital interviewing Dumas, to advise him of the developments and determine what Potchatek wanted him to do with Jones. Donnellan testified that after Potchatek confirmed that Jones' clothing matched the description of the suspect's clothing given by Dumas, Donnellan put Jones in the back of his patrol car and took him to the county jail.

{¶ 42} The state played excerpts of Donnellan's body camera footage for the jury that captured Donnellan's conversation with Jones while transporting Jones to the jail (state exhibit No. 1.2).

{¶ 43} Donnellan testified that while he was transporting Jones to the jail, Jones began to make "counter-accusations against the victim saying that the victim attacked him." Donnellan stated that Jones was "a bigger guy, husky," who weighed "probably 220, 230 pounds, give or take." He estimated that Dumas then weighed 90 or 100 pounds. Donnellan stated that Jones did not show any signs of attack or injury but that he advised Jones that his statement "would go in the report." Potchatek met them at the jail, took custody of Jones and "basically took over from there." Potchatek testified that after he took custody of Jones, Jones told him that Dumas had assaulted Jones but that he, likewise, did not see any visible injuries on Jones.

{¶ 44} Donnellan stated that after clearing the residence, he questioned whether Dumas "did this herself," "thinking that it could have been a possibility." However, he testified at trial that he believed Jones intentionally caused Dumas' injuries and

that he did not consider "any other cause for the fire or [Dumas'] injury" because, based on "the evidence that we found on scene," i.e., the burnt paper and the rubbing alcohol, "it didn't seem accidental that she could have done it herself." Donnellan indicated, however, that when the officers entered Dumas' home they were "just looking for a person" and "the source of a fire," i.e., they were "not looking for any evidence or anything," because they did not have a search warrant.

{¶ 45} Donnellan acknowledged that Dumas' description of the incident did not match what he had observed at the scene in several material respects. Donnellan testified that although Dumas told police that Jones had doused her with gasoline, had attempted to set her house on fire and had damaged her vehicle, there was no gasoline in the home, the house had not been set on fire and Dumas' vehicle had not been damaged. Neither Donnellan nor Potchatek could identify the ignition source for the fire. Donnellan stated that he did not "survey the house" for a lighter, cigarette butts or anything else that could have started the fire in the bedroom. Potchatek stated that the officers did not find any matches or any other ignition source that might have started the fire in the home. Donnellan and Potchatek indicated that they did not know whether Dumas smoked.

{¶ 46} Strehle was charged with writing the police report regarding the incident. He stated that, in preparing the report, he spoke with Dumas and the other officers on scene but that he did not speak with any fire department personnel or the arson investigator. Strehle indicated that, while at the scene, he and the other officers had been discussing the "possibility" that Dumas may have accidentally "set herself on fire" and that, in considering that possibility, they "took into account the physical evidence," i.e., the rubbing alcohol and the fire to the lampshade and "the burns on the victim." Strehle stated that after interviewing Dumas, however, he was no longer concerned that Dumas may have set herself on fire because "[s]he was very adamant of the name and the way he set her on fire." Potchatek testified that after he spoke with Dumas at the hospital — and "got the story" — and Jones appeared at the scene, he likewise decided the incident was not an accident.

{¶ 47} After the report was submitted, the case was referred to the detective bureau, and Donnellan, Potchatek and Strehle had no further role in investigating the case.

{¶ 48} Kim Florczyk ("Florczyk"), a paramedic for the city of Cleveland, was one of the responding EMS personnel who treated Dumas at the scene. During her testimony, Florczyk read from an EMS run report, which states: "PT [Patient] reportedly ha[d] a flammable liquid thrown on her and then was lit on fire. Per PT, PT put herself out by smacking self." Florczyk stated that Dumas had second-degree burns to her chest, neck, lips and wrists and a third-degree burn to her right earlobe. She indicated that Dumas rated her pain as a 10-out-of-10 even after receiving 50 micrograms of fentanyl, so they administered another 50 micrograms of fentanyl to her. Due to her injuries and distress level, Dumas did not sign the "billing signature" on the report; a member of the nursing staff signed for her.

{¶ 49} Dr. Christopher Brandt ("Dr. Brandt"), a burn surgeon at MetroHealth Medical Center, was one of Dumas' treating physicians. He began treating Dumas for her injuries several days after her admission to the hospital. Dr. Brandt described

Dumas' injuries and testified that Dumas had sustained "life-threatening" second-degree and third-degree burns to 16.5 percent of her body, including her chest, shoulders and upper arms, neck, face, hands and forearms. He stated that Dumas underwent multiple surgeries during her six-week hospitalization.

{¶ 50} Cleveland police detective David Sims ("Sims") was assigned to follow up on the case after Potchatek and Strehle turned in their report. He went to the hospital to interview Dumas. Jones, by that time, had already been arrested. Sims testified that he "went to get all the facts, as much as I could, about what happened that night, or the day, and find out if she knew who had committed this crime against her."

{¶ 51} With regard to his first interview of Dumas, Sims testified:

> Q. * * * We're not going to get into the details of what she said, but did she identify a suspect?
>
> A. Yes.
>
> Q. And who was the suspect that she identified?
>
> A. Kelly.
>
> Q. Did you get a last name or no?
>
> A. That's how she had — that's how she identified him, as Kelly. But yes, I learned — I later found out the suspect that was arrested was the defendant.

{¶ 52} He stated that Dumas was "in very bad pain" the first time he questioned her but that she "was well aware of what happened, she was able to speak with me, tell me what happened, who done it." He indicated that Dumas had recalled him from a burglary case he had handled two years earlier, in which several juveniles broke into Dumas' home and stole various items.

{¶ 53} Sims testified that he visited Dumas approximately another three times at the hospital and then on three more occasions at a nursing facility. With regard to his subsequent interviews of Dumas, Sims testified:

> Q. And each time you visited her, was she talking to you about what had happened or were you talking about other things?
>
> A. Every time I visited, we talked about that particular day, what happened.
>
> Q. And again, we're not really going to get into exactly what she said, but did it remain consistent?
>
> A. Yes, it did.
>
> Q. And did she identify the suspect each time?
>
> A. Yeah. She always identified him as Kelly.

{¶ 54} Sims stated that his purpose in interviewing Dumas multiple times was his "continuing investigation," i.e., "I wanted to see what her condition was to make

sure, you know, her statement was the same, if she knew who I was and, you know, who had done this, committed this crime against her." He indicated that he did not have any concern regarding her mental condition but was concerned regarding her physical condition "because of the status she was in" and that he believed her physical condition had been "deteriorating."

{¶ 55} Sims testified that, other than calls to the nursing staff to check up on Dumas, his interviews of Dumas concluded his investigation in the case. He did not interview Jones or anyone else who may have witnessed the incident or who may have known Dumas or Jones when investigating the incident. Other than the brief walk-through of Dumas' residence on the evening of the incident, there is nothing in the record to indicate that police inspected the residence or recovered or tested any physical evidence from the residence. Sims testified:

> A. * * * After I got all the facts from her, as much as I could, I then conferred with the prosecutor and presented the package for them to charge and then I had other stuff to do for the grand jury packet.
>
> Q. Once you finished that charging, does that conclude your involvement?
>
> A. Yes.
>
> * * *
>
> A. * * * I had interviewed the victim and she was well aware of what happened, was able to speak clearly, told me what happened, and I took what I had, the information I had, to the prosecutor and they deemed it was enough to go forward with the charges.

{¶ 56} Sims testified that he was "unaware of any possible mental-health issues" with Dumas when speaking with her and stated that although he had spoken with Potchatek regarding the case, he was unaware that Dumas had been previously referred to CIT because of her mental condition.

**4. Other Evidence**

{¶ 57} Charles Jones ("Charles"), Dumas' nephew, testified that, prior to the incident, he would visit Dumas once "every couple months or have a phone call" with her but could not recall when he last saw her prior to the incident. He indicated that, in the summer of 2018, concerns arose regarding Dumas' "forgetfulness" and he, therefore, "took over" bill payment for Dumas, paying her bills out of her checking account to "make sure she didn't miss any." He stated that, at that time, Dumas still had a car but that he "wasn't sure if she was safe on the road driving" because he "wasn't sure if she was remembering everything with the driving." He indicated, however, that he did not have any concern, prior to the incident, for Dumas' "well-being" or believe that she "shouldn't be living alone." He stated that Dumas was then "pretty independent" and that she liked to go out with her friends. Charles indicated that he did not "know of" Jones and was not aware, prior to the incident, that he or anyone else was living with Dumas.

{¶ 58} Charles testified that he was appointed Dumas' legal guardian for medical decisions in March 2020 and that he was in the process of seeking total legal guardianship of her at the time of trial. He stated that, following the incident, Dumas had spent six months in three different hospitals, had undergone multiple skin graft surgeries and had stayed in three other rehabilitation centers before being transferred to the rehabilitation center where she then resided.

{¶ 59} Charles testified that Dumas was diagnosed with dementia after the incident but that, to his knowledge, she had not been diagnosed with dementia prior to the incident. He stated that he was unaware that Dumas had made a prior report to police that someone was living in her attic. According to Charles, Dumas' mental condition worsened following the incident, i.e., "at a point, she was very forgetful." Although Charles acknowledged that "you never improve" once you have dementia, he stated that Dumas was "doing better now," that she always recognizes him and that he could have a "good conversation" with her.

{¶ 60} Terencita Jones-Green ("Jones-Green"), Dumas' niece and a retired Cleveland police officer, testified that, for the past year, Dumas had been residing at a nursing home in Richmond Heights. She stated that, prior to the incident, Dumas was independent and that she had had no concerns regarding Dumas' mental condition. According to Jones-Green, although Dumas, at that time, showed some signs of forgetfulness, i.e., misplacing her keys and "[t]hat type of issue," she had nothing more than "oldzeimers" — "a nice way to say that our mind is not functioning as well as it used to." Jones-Green stated that, prior to the incident, Dumas had a car and that although she "didn't drive a lot," she drove "wherever she needed to," e.g., to the bank, to the grocery store or to her cousin's house. Jones-Green indicated that she had no concerns, at that time, about Dumas driving.

{¶ 61} Jones-Green denied that concerns regarding Dumas' forgetfulness led Charles to take over Dumas' bill paying in 2018. Jones-Green stated that she had decided to set up automatic bill payment for Dumas (as she had for all her senior family members), so that Dumas would not "have to worry about anything but enjoying [her] life."

{¶ 62} Jones-Green testified that, prior to the incident, she had begun packing Dumas' belongings because Dumas' residence had bed bugs and Jones-Green had arranged to have the house exterminated. She stated that she knew Jones as a "nice" "neighborhood person" who "help[ed] out the seniors" and who would, at times, "go to the grocery store for [Dumas] and do certain things for her." She indicated that Jones had also once used Dumas' car to drive her to the hospital when Dumas needed medical care. Jones-Green testified that she did not know Jones was staying with Dumas until after the incident and did not see any of his things when packing Dumas' belongings in preparation for the exterminator. She stated that the front bedroom was not Dumas' bedroom and that she did not go into that room when packing up the house other than to turn up the mattress per the exterminator's instructions. Jones-Green indicated that Dumas smoked marijuana but not cigarettes.

{¶ 63} Jones-Green testified that, as a result of the incident, Dumas can no longer use her hands, that several of her fingers "don't move," that a lip and part of her neck "won't move" and that she has a feeding tube in her stomach. She stated that when visiting Dumas, Dumas has never had trouble recognizing her and has always known who she is. Jones-Green indicated that she had never been made aware that Dumas has dementia but acknowledged that she had not been "actively involved" in her aunt's medical care for several years.

{¶ 64} The state introduced medical records, detailing Dumas' injuries, diagnoses and medical care and treatment related to the incident. The medical records include an "emergency department — visit note" authored by Julia Coppi, M.D., dated July 12, 2019, at 11:47 p.m., which states, in relevant part, as follows:

> The history is provided by the Patient and EMS. Ernestine Dumas is a 78-year-old female presenting to the ED as a CAT 2 trauma activation. Mechanism was * * * physical assault with * * * thermal burns. Brought in by CEMS. This occurred approximately 1 hour * * *, the patient was in a fight with a person who was a friend of a friend living in her house. The argument escalated and she was doused with a flammable liquid ?gasoline [sic] or rubbing alcohol and lit on fire with a piece of paper thrown on her while on fire. She states he attacked her and punched her in the face, but currently denies facial pain * * * Patient currently complaining of pain over chest, arms, anywhere with burns. * * *

{¶ 65} At the conclusion of the state's case, Jones moved for a mistrial based on his "ongoing objections to the hearsay" statements that had been admitted into evidence during the trial, asserting that "there is no instruction that is able to cure the damage caused by the admissibility of that hearsay evidence." He also moved for acquittal pursuant to Crim.R. 29. The trial court denied both motions.

{¶ 66} Jones did not testify at trial and did not present any witnesses on his behalf.

(ECF No. 9-1, PageID #: 266-92) (footnotes omitted).

## III. Relevant State Procedural History

### A. Indictment, Trial, and Sentencing

A Cuyahoga County grand jury indicted Petitioner for attempted murder, felonious assault, arson, domestic violence, and two counts of aggravated arson. (ECF No. 9-1, PageID #: 91-95). Petitioner pled not guilty to all charges. (*Id.* at PageID #: 97). The case proceeded to trial and on June 22, 2021, a jury found Petitioner guilty of aggravated arson, felonious assault, arson, and domestic violence, but not guilty of attempted murder and the second aggravated arson count. (*Id.*

at PageID #: 110-11; *see id.* at PageID #: 225). The trial court sentenced Petitioner to an aggregate sentence of 30.5 years. (*Id.* at PageID #: 112-14).

### B. Direct Appeal

Petitioner appealed his convictions and sentence. (ECF No. 9-1, PageID #: 117). Jones raised the following assignments of error on appeal:

1. The trial court erred in the admission of hearsay evidence and testimonial statements, in violation of Appellant's right to confront his accusers, as protected by the Sixth Amendment of the United States Constitution.

2. The trial court erred by failing to grant a judgment of acquittal, under Crim.R.29(A), on the charges, and thereafter entering a judgment of conviction of those offenses as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

3. Appellant's conviction are against the manifest weight of evidence.

4. The trial court erred by ordering convictions and a separate sentence for separate counts because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transaction under R.C. 2929.14.

5. The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

6. The trial court erred by imposing an indefinite prison sentence upon Appellant which is unconstitutional.

7. The trial court erred by allowing the State to re-open its case to present additional evidence after all verdicts had already been rendered.

(*Id.* at PageID #: 128-68). The State filed an Appellee's Brief. (*Id.* at PageID #: 170-218). On June 9, 2022, the state appellate court sustained Petitioner's first assignment of error, reversed the judgment, and remanded the case for a new trial. (*Id.* at PageID #: 219-33). The State moved to stay proceedings so that it could seek further review of the appellate court's decision. (*Id.* at PageID #: 235-36). The trial court granted the stay on June 13, 2022. (*Id.* at PageID #: 237).

The State then moved for reconsideration/en banc consideration in the appellate court. (*Id.* at PageID #: 239-50). Petitioner filed an opposition brief. (*Id.* at PageID #: 252-60). On reconsideration, the appellate court affirmed in part, reversed in part, vacated in part, and remanded for a resentencing hearing. (*Id.* at PageID #: 261-359). Specifically, the appellate court affirmed the guilty verdicts as to each offense but concluded that the aggravated arson and felonious assault offenses were allied offenses such that they should be merged for sentencing. (*Id.*).

On remand, the trial court sentenced Petitioner to imprisonment for a minimum of 22 years and 6 months and a maximum of 28 years. (*Id.* at PageID #: 361-66).

### D. Appeal to the Ohio State Supreme Court

On April 4, 2023, Jones filed a notice of appeal to the Supreme Court of Ohio. (ECF No. 9-1, PageID #: 385-86). Jones raised the following propositions of law in support of jurisdiction:

1. An out of court statement that relates to a recent startling event does not constitute an excited utterance under Evid. R. 803(2) unless the evidence demonstrates that the declarant was under the influence of stress or excitement relating to the event.

2. An out of court statement made while under the stress or excitement of a startling event will not be admissible under the excited utterance exception of Evid. R. 803(2) unless the court is satisfied that the declarant had the capacity to be a competent witness at the time the statement is made.

3. When erroneously admitted hearsay provides greater detail and the appearance of being corroborated to a greater extent than the evidence that was properly admitted, the doctrine of harmless error will not apply.

(*Id.* at PageID #: 387-97). The State filed a cross appeal and opposed Petitioner's appeal. (*Id.* at PageID #: 400-21). On August 15, 2023, the Supreme Court of Ohio declined to accept jurisdiction over the case. (*Id.* at PageID #: 426).

## IV. Federal Habeas Corpus Petition

On August 13, 2025, Jones filed a pro se petition for federal habeas corpus relief. (ECF

No. 1). Jones asserted the following grounds for relief:

(1) The trial court erred in the admission of hearsay evidence and testimonial statements in the absence of the witness, in violation of Petitioner's right to confront his accusers, as protected by the Sixth and Fourteenth Amendments of the United States Constitution.

(2) There was insufficient evidence to support Petitioner's convictions, in violation of his Due Process protections under the Fourteenth Amendment to the United States Constitution.

(3) The trial court erred by allowing the State of Ohio to reopen its case as to the repeat offender violent offender specification, after all jury verdicts had been rendered, in order to present additional evidence, which violated Petitioner's protection against Double Jeopardy under the Fifth and Fourteenth Amendments to the United States Constitution.

(*Id.* at PageID #: 5-10). Respondent filed a return of writ, arguing Petitioner's grounds for relief are procedurally defaulted and/or meritless. (ECF No. 9).

## V. Legal Standards

Because Petitioner is a state prisoner seeking federal habeas relief, his petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), and corresponding case law.

### A. Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in the application of state law … are usually not cognizable in federal habeas courts." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional

state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

**B. Exhaustion**

Under 28 U.S.C. § 2254(b), a state prisoner seeking federal habeas relief must exhaust "the remedies available in the courts of the State" or show that (1) there is an absence of available State corrective process or (2) circumstances exist that render such process ineffective to protect the prisoner's rights. "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To satisfy the exhaustion requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. However, when a petitioner fails to exhaust all of his state law remedies but can no longer do so under state law, the claim becomes procedurally defaulted. *Id.* at 848.

**C. Procedural Default**

Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by the state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-84 (1977); *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In determining whether there has been a

procedural default, the federal court looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). When a state court declines to address a prisoner's federal claims because the petitioner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner procedurally defaults a claim by failing to "fairly present" the claim in state court when he does not pursue that claim through the state's "ordinary appellate review procedures," and, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still

available at the time of the federal petition,' … it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law." *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner can overcome a procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. Under this test, cause "must be something external to the petitioner, something that cannot be fairly attributed to him." *Id.* "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004) ("The 'fundamental miscarriage of justice' gateway is open to a petitioner who submits new evidence showing that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995))).

**D. AEDPA Standard of Review**

Turning to claims addressed on the merits in state court proceedings, 28 U.S.C. § 2254(d) provides that federal habeas relief shall not be granted unless the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id*.

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts decision conflicts with this Court's precedents" and "goes no further." *Id*. Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## VI. Discussion

Respondent argues Petitioner's claims are procedurally defaulted and/or meritless. (*See* ECF No. 9).

### A. Procedural Default

Respondent argues that Jones's entire petition is procedurally defaulted because he "did not pursue Ground 1 as a federal constitutional claim at the Supreme Court of Ohio," did not "pursue Ground 2 to the Supreme Court of Ohio at all," and "did not pursue Ground 3 to the Supreme Court of Ohio or develop a constitutional argument in the Ohio Court of Appeals." (ECF No. 9 at 27).

In his traverse, Jones "withdraws Ground 3 from this petition." (ECF No. 12 at 9). Jones argues that ground one "combined the three interrelated propositions of law" raised in his memorandum in support of jurisdiction ("MISJ") to the state supreme court; he cited federal law in support of the MISJ; and the MISJ is "not the vehicle for fully and meaningfully litigating any of the claims raised within it." (*Id.* at 4-7). As to ground two, Petitioner concedes that he did not raise this issue to the state supreme court. (*Id.* at 7). However, he asserts that his appointed counsel "never consulted with [him] before filing the MISJ" and argues the default should be excused because failure to consider his sufficiency claim will result in a manifest injustice. (*Id.*). Specifically, he asserts that "[i]f this Court finds in Petitioner's favor on Ground 1, that will provide the constitutional error supportive of excusing a procedural default for Ground 2." (*Id.* at 7-8).

Respondent argues in his sur-reply that on appeal, Petitioner "made a passing reference, without any elaboration, to the Sixth Amendment" such that it was insufficient to exhaust his claims and Petitioner raised separate evidentiary arguments, not constitutional claims. (ECF No. 13 at 17). Respondent argues that "an argument that the state court improperly held statements to be excited utterances differs significantly from one that a trial court admitted a statement in

violation of the Confrontation Clause." (*Id.* at 17-18). As to ground two, Respondent argues Petitioner did not have a right to counsel before the state supreme court so he cannot rely on counsel's failure to raise the claim as cause to excuse the default and, even if he could, such a claim is itself procedurally defaulted. (*Id.* at 19-20). Additionally, Respondent argues that "[b]ecause Petitioner only relies on the purported merit of Ground 1, he has not shown a fundamental miscarriage of justice" because such requires a showing of *factual* innocence rather than mere legal insufficiency. (*Id.* at 20).

**1. Ground One-Procedurally Defaulted**

Having reviewed Petitioner's state court filings, the undersigned agrees with Respondent that Petitioner did not fairly present his Confrontation Clause claim to the state supreme court. For an issue to have been fairly presented before a state supreme court, a petitioner must have "(1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017). "While a petitioner need not cite 'chapter and verse' of constitutional law, general allegations of the denial of rights to a 'fair trial' and 'due process' do not fairly present claims that specific constitutional rights were violated." *Id.* (citation modified).

Here, there can be no dispute that Petitioner raised his Confrontation Clause claim to the intermediate appellate court as a federal constitutional issue. (*See* ECF No. 9-1, PageID #: 151-55 (citing the Sixth Amendment and *Crawford v. Washington*, 541 U.S. 36 (2004))). The problem, however, is that Petitioner did not frame his challenge with this same degree of clarity in his MISJ to the Ohio Supreme Court. (*See id.* at PageID #: 387-97). Rather, the MISJ framed the issues as

challenging whether statements were properly considered excited utterances under *state* evidentiary law and whether their admission could be considered harmless error. (*Id.*). Petitioner cited two out of circuit federal criminal cases in support of his harmless error argument but failed to include any constitutional analysis and argument. (*Id.* at PageID #: 391). Petitioner asserted in a single statement that the admission of a hearsay statement "violated Fourteenth Amendment due process as well as Sixth Amendment confrontation." (*Id.* at PageID #: 395). However, this was insufficient to fairly present the constitutional issue to the state supreme court. *See Hand*, 871 F.3d at 418-19 (petitioner's allegations that "introductions of … instances of prior-bad-acts evidence violated 'his rights to a fair trial, due process and a reliable determination of his guilt and sentence' as guaranteed by the Fifth, Sixth, and Fourteenth Amendments" was insufficient to fairly present his constitutional claims to the state court).

To the extent Petitioner argues that the page limits imposed on the MISJ prevented him from including federal constitutional analysis, the undersigned finds this argument unavailing. The Sixth Circuit has observed that a page limit "merely limit[s] the manner in which [a petitioner] could present [his] arguments," but "d[oes] not wholly prevent [him] from presenting them" such that a page limitation did not excuse a procedural default. *Seymour v. Walker*, 224 F.3d 542, 551 (6th Cir. 2000). Further, even if the Court were willing to accept this argument, it does little to aid Petitioner because he did not utilize the pages available to him in his MISJ. Rule 7.02(b) of the Rules of Practice of the Supreme Court of Ohio provides that "[e]xcept in postconviction death-penalty cases, a memorandum in support of jurisdiction shall not exceed fifteen numbered pages, exclusive of the table of contents, the signature block, and the certificate of service." But here, Petitioner's MISJ totaled nine numbered pages. (ECF No. 9-1, PageID #: 389-97). Thus, Petitioner had an additional six pages in which he could have raised constitutional issues but failed to do so.

Because Petitioner failed to present his Confrontation Clause claim at every level of the state courts, it is procedurally defaulted. Thus, review of this claim "is barred unless [he] can demonstrate cause for the default and actual prejudice ... or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. However, Petitioner makes no argument regarding cause and prejudice regarding ground one. (*See generally* ECF No. 12). Nor does he argue that failure to consider ground one would result in a miscarriage of justice. (*Id.*). Accordingly, he has failed to establish grounds to excuse the procedural default of ground one and such should be dismissed.

**2. Ground Two-Procedurally Defaulted**

Petitioner concedes that he did not present his insufficiency claim to the state supreme court but asks the Court to "delay a finding on whether he procedurally defaulted Ground 2 until it has decided the merits of Ground 1." (ECF No. 12 at 8). Petitioner seems to argue that if the Court determines that the admission of certain testimony violated Petitioner's Confrontation Clause rights, failing to consider his sufficiency claim would result in a fundamental miscarriage of justice because there was insufficient evidence to convict him without the challenged testimony. (*Id.* at 8, 31-34). However, as discussed above, Petitioner's Confrontation Clause claim is procedurally defaulted such that this Court need not consider the merits. Further, Petitioner does not point to any new evidence of his factual innocence to support his assertion that failure to consider his claim would result in manifest injustice. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316. Thus, because Petitioner has not pointed to any new evidence supporting his factual innocence, he has failed to overcome the procedural default and ground two is properly dismissed.

**3. Ground Three-Withdrawn**

In response to Respondent's argument that ground three was procedurally defaulted, Petitioner withdrew ground three. (ECF No. 12 at 9). Thus, the Court should dismiss ground three without further discussion.

**B. Merits**

Respondent also argues that Petitioner's claims are all meritless. (*See* ECF No. 9 at 31-54). However, should the Court adopt the undersigned's above recommendation that grounds one and two are procedurally defaulted and Petitioner has withdrawn ground three, the petition is already subject to dismissal. Thus, the undersigned declines to address the merits at this time.

## VII. Certificate of Appealability

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability ("COA") and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right.").

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, the petition is procedurally defaulted and should be dismissed. If the Court accepts the foregoing recommendation, Petitioner has not shown that jurists of reason would find it debatable whether his petition was procedurally defaulted. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

## VIII. Recommendation

Petitioner has presented only procedurally defaulted claims. Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

Dated: October 20, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).